IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GERALDINE HOLMES | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| VS. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security, | : | |
| Defendant | : | NO. 07-2356 |

## REPORT AND RECOMMENDATION

**LINDA K. CARACAPPA**
**UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Geraldine Holmes, brought this action under 42 U.S.C. § 405(g), seeking

judicial review of the final decision of the Commissioner of Social Security (Commissioner)

denying plaintiff's claim for disability insurance benefits (DIB) and supplemental security income

(SSI) under Titles II and XVI of the Social Security Act (Act). The parties have filed cross-

motions for summary judgment. For the reasons which follow, it is recommended that both

motions be denied and the case remanded to the Commissioner.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is a forty-three (43) year-old female born on September 28, 1964 (Tr. 50).

Plaintiff has an eleventh grade education, and relevant past work experience as a daycare worker,

cashier, and women and children's shelter worker (Tr. 260-262). Disability is alleged as of

October 27, 2004 due to neck, back, and shoulder pain.

Plaintiff's application was denied initially, and she then requested a hearing before an Administrative Law Judge (ALJ).  A hearing was commenced on July 24, 2006; plaintiff was represented by counsel and testified, along with a vocational expert (VE) (Tr. 254-287).  In a decision dated, September 7, 2006, the ALJ determined that the plaintiff "has had the following severe impairments: degenerative disc disease of the cervical spine, status post surgeries in March 2005 and March 2006 and bilateral shoulder pain, status post excision of lipomas on both the right and left upper extremities."  The ALJ found further that "from October 26, 2004 through May 8, 2006, the claimant had the residual functional capacity to do a range of light to sedentary work, but she was unable to sustain work on an eight- hour a day, five days a week schedule."  Plaintiff was, thus, determined to be disabled and entitled to benefits for this period.  However, the ALJ further determined that "beginning on May 9, 2006, the claimant has had the residual functional capacity to perform light (and therefore also sedentary) exertional work with the need to avoid reaching above shoulder level on the right and left sides no more than occasionally."  The ALJ went on to conclude that beginning May 9, 2006, plaintiff has been capable of performing her past relevant work as a day care worker, and was no longer entitled to benefits (Tr. 17-26).

The ALJ's findings became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on April 11, 2007 (Tr. 4-6).  Presently, plaintiff has appealed that decision to this court.

2

## JUDICIAL REVIEW

The role of this court, on judicial review, is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Pierce v. Underwood, 587 U.S. 552 (1988).  "Substantial evidence" is not "a large or significant amount of evidence but rather such relevant evidence as a reasonable mind might accept to support a conclusion." Id. at 664-65.  "The Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record."  Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).

To establish a disability under the Social Security Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  Stunkard v. Secretary of Health and Human Services, 841 F.2d 57 (3d Cir. 1988), quoting Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. § 423(d)(1) (1982).  A claimant can establish such a disability in either of two (2) ways: (1) by producing medical evidence that one is disabled per se as a result of meeting or equaling certain listed impairments set forth in 20 C.F.R. Regulations No. 4, Subpart P, Appendix 1 (1987); see Heckler v. Campbell, 461 U.S. 458 (1987); Stunkard v. Secretary of Health and Human Services, 841 F.2d at 59; Kangas v. Bowen, 823 F.2d at 777; or (2) by demonstrating an impairment of such severity as to be unable to engage in "any kind of substantial gainful work which exists in the national economy."  Heckler v. Campbell, 461 U.S. at 461; 42 U.S.C. § 423(d)(2)(A).

This method of proving disability requires that the claimant first show inability to return to former work due to a physical or mental impairment.  Once a claimant has demonstrated inability to perform former work, the burden shifts to the Commissioner to prove that there is some other

kind of substantial gainful employment claimant is able to perform, taking into consideration the claimant's physical ability, age, education and work experience.  See Kangas v. Bowen, supra; Rossi v Califano, 602 F.2d 55, 57 (3d Cir. 1979); 42 U.S.C. § 423(d)(2)(A).

This case was decided under the medical-vocational regulations which require a five-step sequential evaluation of disability claims.  See generally, Heckler v. Campbell, supra; Santise v. Schweiker, 676 F.2d 925 (3d Cir. 1982).  The sequential evaluation considers in turn current work activity, the severity of impairments, the ability to perform past work and vocational factors.  20 C.F.R. §§ 404.1520 and 416.920.

In this case, the Commissioner reached the fourth step of the evaluation and determined that plaintiff is capable of performing her past work as a daycare worker.


## MEDICAL HISTORY

The relevant evidence in this case consists of medical reports and testimony which are summarized as follows:

On January 20, 2005, plaintiff was examined by Dr. Edward Emmett at the request of the Pennsylvania Bureau of Disability Determination.  Dr. Emmett indicated that plaintiff complained of back and neck pain for which she takes a muscle relaxant and anti-inflammatory medication.  Dr. Emmett noted that an MRI of the left arm performed in August 2003 was a normal study.  Dr. Emmett also completed a Work-Related Activities form.  Dr. Emmett opined that plaintiff had the physical ability to occasionally lift and carry 10 pounds, and plaintiff to have no limitation standing, walking, and sitting (Tr. 82-83).

Plaintiff had cervical spine x-rays performed on January 19, 2005.  Impression of the x-

rays was "[F]usion of C5-6 which may be congenital.  Spondylosis[1] deformans and discognenic[2] disease" (Tr. 89).

Dr. Christian Fras, an orthopedic surgeon at the University of Pennsylvania Medical Center, reported on March 16, 2005 that he performed neck surgery on the plaintiff and that plaintiff was about two weeks out from "anterior cervical diskectomy and fusion.  Overall, she is doing well with minimal neck pain."  Dr. Fras was to see plaintiff back in four weeks (Tr. 183).

An MRI of the cervical spine was performed on May 12, 2005.  Such revealed "status post cervical spine fusions at C4-5 and C6-7 [and] multiple degenerative changes most pronounced at the C4-5 level, where severe posterior osteophytic spurring and a moderate to severe posterior osteophytic spurring and a moderate to large left paracentral disc protrusion result in moderate narrowing of the spinal cord signal is apparent within the C4-5 and C6-7 levels" (Tr. 190).

Plaintiff was seen at the Penn Pain Medicine Center on October 7, 2005.  Greta Stewart, D.O., indicated that plaintiff "continues to suffer from chronic neck pain secondary to postlaminectomy syndrome, cervical degenerative disc disease, cervical radiculopathy [3], and myofascial pain" (Tr. 146).  Dr. Stewart saw plaintiff again on October 31, 2005, and stated that plaintiff was "status post cervical laminectomy and fusion at levels C4-C5 and C6-C7."  Plaintiff continued to note neck pain radiating into the trapezius muscles, but with no radicular pain.  Dr.

---

[1]Spondylosis- a general term for degenerative spinal changes due to osteoarthritis.  Dorland's Illustrated Medical Dictionary, Twenty-ninth Edition, 2000, p. 1684.

[2]Discogenic- caused by derangement of an intervertebral disk.  Dorland's at 510

[3]Radiculopathy−  disease of the nerve roots.  Dorland's at 1511.

Stewart recommended hot and moist heat to the affected area, and stated that trigger point injections would be considered (Tr. 144-145).

Plaintiff continued to be followed monthly by her surgeon, Dr. Fras. Dr. Fras reported on November 1, 2005 that plaintiff's fentanyl patch was stopped by pain management, and that she has no radicular arm pain, arm numbness, and no weakness. Dr. Fras added that she has some neck stiffness and neck pain, but this seemed manageable for her. Dr. Fras further noted that physical examination showed full strength in bilateral upper and lower extremities. Dr. Fras' impression was "residual neck pain after anterior cervical decompression and fusion" (Tr. 173).

On December 21, 2005, a discharge report from the University of Pennsylvania Health System indicated that plaintiff had been evaluated after three visits. Plaintiff reported a 0 out of 10 on a pain index and a neck disability index of 0 out of 100. The report stated that plaintiff was "now independent with her cervical spine range of motion exercise program in addition to scapular stabilization and shoulder strengthening exercises. She has met all of her goals that were established on initial evaluation and she requires no further skilled goals at this time" (Tr. 160). She was also taking no medication at this time and was discharged from supervised physical therapy.

On February 7, 2006, plaintiff saw Dr. Fras and he reported that plaintiff was having more neck pain with bilateral hand tingling. Dr. Fras diagnosed plaintiff with C4-C5 stenosis and discussed fusion surgery with her. Plaintiff subsequently underwent such surgery which was performed by Dr. Fras. (Tr. 235-238).

Plaintiff returned to see Dr. Fras postoperatively on May 9, 2006. Dr. Fras reported that plaintiff was about 6 weeks post anterior cervical diskectomy and fusion, and that she was "doing

6

really very well." She had no neck or arm pain, was taking no anti-inflammatories, and was very pleased with the results of her surgery. Dr. Fras added that physical examination showed "good strength in bilateral upper and lower extremities in all muscle groups" and that x-rays of the cervical spine demonstrated "hardware in good position and bone graphs in good position, consolidating well." Dr. Fras was to see plaintiff back in two months (Tr. 231).

The following reports were not considered by the ALJ and are submitted as new evidence by the plaintiff:

In a follow-up report on August 15, 2006, Dr. Fras reported that plaintiff has some tolerable neck pain, but no radicular arm pain. "Overall, she seems to be very pleased with her situation. She is not smoking and she reports avoiding anti-inflammatory medications." Dr. Fras added again that physical examination showed that manual strength testing revealed "full strength in bilateral upper and lower extremities in all muscle groups." Dr. Fras' impression was "status post anterior cervical diskectomy and fusion doing well." Dr. Fras added further that plaintiff declined "any physiotherapy citing lack of symptoms" (Tr. 243).

Dr. Fras saw plaintiff several months later for a follow-up exam on December 19, 2006. Dr. Fras stated that plaintiff had some neck pain, but no radicular arm pain, and that plaintiff does not take any medications on a regular basis for her neck pain. Physical examination again demonstrated good strength in bilateral upper extremities (Tr. 244).

Six x-ray views of plaintiff's cervical spine were taken on December 19, 2006 and compared to views taken in May 2006. Dr. Judy Blebea reported that "[T]here is normal alignment of the cervical spine. There has been anterior cervical fusion and discectomy with interbody fusion with bone graphs from C4-C7. No fracture or disengagement of the surgical

hardware is noted.  There is no evidence of abnormal motion flexion or extension.  There are some mild degenerative changes at the C3/4 disc space.  Mild narrowing of the C4/5 neural foramen on the right is seen" (Tr. 249).

Plaintiff returned to see Dr. Fras on March 13, 2007.  Plaintiff had neck and shoulder pain, and some numbness, pins and needles, and tingling in the arms, but no radicular arm pain, no weakness in her arms, and no change in gait or balance.  Physical examination once again showed "full strength in bilateral upper and lower extremities in all muscle groups."  X-rays showed the hardware to be in good position and there is a solid fusion.  Dr. Fras' impression was "possible shoulder impingement syndrome," and he referred plaintiff for physiotherapy (Tr. 245).

Plaintiff submitted the following additional report from Dr. Fras dated September 18, 2007 which is not part of the record, but attached to plaintiff' summary judgment motion.  Dr. Fras reported that plaintiff returned to see him with complaints of neck pain.  Dr. Fras added that plaintiff also has some bilateral shoulder pain, but it appears that plaintiff's neck pain is what bothered her the most.  "Manual strength testing reveals full strength in bilateral upper and lower extremities in all muscle groups."  X-rays showed that the "fusion does not appear to be really well consolidated at C4-C5 and C6-C7.  She has an autofusion at C5-C6."  Dr. Fras' impression was "possible pseudoarthrosis at C4-C5 and C6-C7."  Dr. Fras added that he discussed both surgical and nonsurgical treatment options with plaintiff.  "She has certainly tried a lot of nonsurgical options such as physiotherapy and injections.  These have not really gotten her tremendous amount of relief.  She would like to consider surgical intervention."  Dr. Fras added that he wanted to send plaintiff for a CT scan of her cervical spine to evaluate the fusion to more accurately confirm the existence of a pseudoarthrosis (See report attached to Plaintiff's Motion

8

for Summary Judgment).

Plaintiff testified at the administrative hearing that before her second surgery in March 2006, she was having neck pain which radiated down the middle of the spine, and she had numbness in her hands and arms.  Plaintiff testified further that after the second surgery, she experienced the same problems, and had no improvement, is less comfortable at night and can't get comfortable sitting in a chair or standing, and can only lift 2-5 pounds and her teenage kids do the chores around the house (Tr. 266-270).


## DISCUSSION

The Commissioner's findings must be affirmed if they are supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971).  The role of this court is to determine whether there is substantial evidence to support the Commissioner's decision.  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924, 113 S. Ct. 1294 (1993).

In coming to a decision, it is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence.  Richardson v. Perales, supra.

In this case, the ALJ found that the medical evidence establishes that plaintiff "has had the following severe impairments: degenerative disc disease of the cervical spine, status post surgery in March 2005 and March 2006 and bilateral shoulder pain, status post excision of

lipomas[4] on both the right and left upper extremities."  It was further determined by the ALJ that "from October 26, 2004 through May 8, 2006, the claimant had the residual functional capacity to do a range of light [5] to sedentary work, but she was unable to sustain work on an eight hour a day, five days a week schedule."  Plaintiff was, thus, determined to be disabled and entitled to benefits for this period.  However, the ALJ went on to determine that "beginning on May 9, 2006, the claimant has had the residual functional capacity to perform light (and therefore also sedentary) exertional work with the need to avoid reaching above shoulder level on the right and left sides no more than occasionally."  The ALJ concluded that beginning May 9, 2006, plaintiff has been capable of performing her past relevant work as a day care worker, and was no longer entitled to benefits (Tr. 17-26).  For the reasons which follow, this court finds that the ALJ's decision is not supported by substantial evidence, and the matter should be remanded to the Commissioner.

Plaintiff first argues in her motion for summary judgment that the ALJ erred by finding that her condition improved thereby terminating her period of disability.  Plaintiff asserts that she had two cervical neck surgeries with a year period, the first in March 2005 and the second in March 2006, so that it was "premature and unreasonable for the ALJ to find that sustained medical improvement had occurred based on six weeks of recovery after the second cervical surgery." We agree.

---

[4]Lipoma- a benign soft, rubbery, encapsulated tumor of adipose tissue, usually composed of mature fat cells.  Dorland's at 1016.

[5]Light work requires a claimant to have the exertional abilities to lift no more than twenty pounds at a time, sit, and stand/walk for six hours in a workday.  20 C.F.R. § 404.1567(b); Social Security Ruling 83-10.

In January 2005, cervical x-rays showed "[F]usion of C5-6 which may be congenital. Spondylosis deformans and discogenic disease" (Tr. 89). Two months later in March 2005, Dr. Christian Fras, an orthopedic surgeon at the University of Pennsylvania Medical Center, performed an "anterior cervical diskectomy and fusion" (Tr. 183). Plaintiff continued to be treated for neck pain[6] after the surgery at the Penn Pain Medicine Center. In October 2005, Dr. Greta Stewart reported that plaintiff "continued to suffer from chronic neck pain secondary to postlaminectomy syndrome, cervical degenerative disc disease, cervical radiculopathy, and myofascial pain" (Tr. 146).

It was about this time that Dr. Fras, plaintiff's treating physician and surgeon, reported some improvement in plaintiff's condition. Dr. Fras indicated on November 1, 2005 that plaintiff's fentanyl patch was stop by pain management. Plaintiff had no radicular arm pain, arm numbness, and no weakness. Plaintiff had some neck stiffness and pain, but it was manageable for her. Dr. Fras did not recommend surgery, but physical therapy (Tr. 173). The next month, in December 2005, plaintiff was discharged from the University of Pennsylvania Health System after several physical therapy visits. It was reported that plaintiff met all her goals, was taking no medication, and was discharged from supervised physical therapy (Tr. 160).

However, less than two months later on February 7, 2006, Dr. Fras reported that plaintiff's neck condition and pain had deteriorated to the point that she might require further

---

[6]Subjective evidence of pain and disability must be considered in determining if a claimant is disabled under the Act.  Smith v. Califano, 637 F.2d 968 (3d Cir. 1981).  Subjective complaints of pain do not require substantiation by clinical findings, Smith v. Califano, supra; Farmer v. Weinberger, 368 F. Supp. 1 (E.D. Pa. 1973), but they must bear on the claimant's physical status, including adverse objective medical findings, diagnoses and opinions.  Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1973), cert. denied, 420 U.S. 931 (1975); Baith v. Weinberger, 378 F. Supp. 603 (E.D. Pa. 1974); see also 20 C.F.R. §§ 1526, 1529.

surgery.  Dr. Fras stated that plaintiff was having more neck pain with bilateral hand tingling, and

diagnosed her with C4-C5 stenosis and discussed fusion surgery with her (Tr. 235-238).

Subsequently, such surgery was necessary and Dr. Fras performed the cervical fusion surgery in

March 2006 (Tr. 232-238).

As already noted above, based on this history, the ALJ determined that plaintiff was

unable to sustain work on an eight hour a day, five days a week schedule and was, thus, disabled

and entitled to benefits between October 26, 2004 through May 8, 2006.  However, the ALJ

determined that as of May 9, 2006, plaintiff's disability ended.  The ALJ stated:

> "[T]here was medical and functional improvement realized after the second cervical
> surgery.  The claimant had neck and arm pain with bilateral hand tingling (Exhibit 10F/3)
> and the magnetic resonance imaging studies showed stenosis at the C4-5 level.  But after
> the surgery the claimant was noted to be doing very well with neck and arm pain gone
> (Exhibit 10F/1 and 2).  Radiographs showed the fusion hardware to be in good condition
> (Exhibit 10F/8)" (Tr. 24).

It is our opinion, in this case, that the ALJ's decision that the plaintiff's neck condition

improved significantly on or after May 8, 2006 is not supported by substantial evidence.  It is

puzzling to us that based on the plaintiff's past history which documented that plaintiff required

another neck fusion surgery within a year of a previous one by the same surgeon that the ALJ

could determine that plaintiff's condition had improved enough to return to work only eight

weeks after a second fusion surgery.  We believe that such past neck history demonstrates just the

opposite, and indicates that plaintiff would need to continue to be evaluated by Dr. Fras for a

substantial period of time to assess her progress in order to determine if this second surgery was

successful enabling plaintiff to work on a sustained basis.

As indicated above, plaintiff had neck fusion in March 2005 that had given her relief for

several months, and for a time in the fall of 2005, it appeared that the surgery had successfully treated her neck pain.  However, the severe neck pain and other related problems resurfaced in December 2005 and deteriorated over the next two months necessitating a second surgery  for the same condition by the same orthopedic surgeon, Dr. Fras.  Thus, there is certainly nothing in plaintiff's history from Dr. Fras which would indicate that plaintiff's second fusion surgery was successful just a mere eight weeks after this surgery.  We think it was incumbent upon the ALJ to keep the record open for a significant amount of time after May 8, 2006 to be able to follow her progress under Dr. Fras, and such conclusion leads us to agree with plaintiff's next argument.[7]

Plaintiff next asserts that she should be granted a "sentence six remand" to the Commissioner for consideration of new and material evidence.[8]  Sentence six of Section 405(g) of the Social Security Act, 42 U.S.C. § 405(g), provides that the court may remand for further proceedings where new and material evidence exists, but only upon a showing of "good cause" for not presenting this evidence to the ALJ.  Matthews v. Apfel, 239 F.3d 589 (3d Cir. 2001).

To warrant a new evidence remand, the plaintiff must show: 1) the evidence is "new" and not merely cumulative of what is already in the record; (2) the evidence is "material", i.e., relative and probative, and there is a reasonable possibility that the new evidence would have

_____

[7]It must be noted that plaintiff did testify at the administrative hearing that after her second surgery, she continued to experience many of her same problems namely neck pain which radiated down her spine and numbness in her hands and arms.  She added that she had no improvement after the second surgery (Tr. 266-270).

[8]The new evidence that plaintiff asserts should be considered on remand which she submitted to the Appeals Council, but was not before the ALJ, are treatment records from Dr. Fras covering the period after May 9, 2006 through March 27, 2007, and cervical x-rays reports dated May 9, 2006, August 15, 2006, and December 19, 2006.  Plaintiff also asserts that a report dated September 18, 2007 (attached to her Motion for Summary Judgment) should be considered upon remand.

changed the outcome of the Secretary's determination; 3) the evidence must not concern a later-acquired disability or a subsequent deterioration of the previously non-disabling condition; and 4) there is "good cause" for not having included the new evidence in the record.  Szubak v. Secretary of Health and Human Services, 745 F.2d 831 (3d Cir. 1984).

Here, we are of the opinion that plaintiff has established "good cause" and has met the other criteria in Szubak to justify a section six "new evidence" remand.  First, the additional evidence is new and non-repetitive.  The medical history from Dr. Fras after plaintiff's first fusion surgery establishes this because his initial reports in the months following that surgery indicated improvement, but his later reports showed that plaintiff's condition quickly deteriorated after approximately nine months post-surgery and required a subsequent surgery.  Likewise, in the eight weeks after the second fusion surgery, Dr. Fras' reports reflected improvement, but his later reports in 2006 and 2007 indicate that plaintiff's condition had not improved enough to allow her to work, and also possibly deteriorated again to the point that she may require yet a third surgery.  While some of the new evidence subsequent to May 9, 2006 indicated improvement in plaintiff's condition, later reports showed deterioration.  On August 15, 2006, Dr. Fras wrote that plaintiff has some tolerable neck pain, but overall she seemed pleased with her situation (Tr. 231).  On December 19, 2006, Dr. Fras indicated that plaintiff was having some neck pain, but she was not taking pain medication on a regular basis (Tr. 244).

However, on March 13, 2007, in a scenario very similar to a year earlier when plaintiff's neck condition which had been relatively stable, quickly deteriorated necessitating a second fusion surgery, Dr. Fras reported that plaintiff was having neck and shoulder pain, numbness, pins and needles, and tingling in the arms.  Dr. Fras' impression was "possible shoulder

14

impingement syndrome," and he referred plaintiff for physiotherapy (Tr. 245).  Furthermore, the additional report submitted with plaintiff's summary judgment motion dated September 18, 2007 confirms that plaintiff's condition did continue to deteriorate to the point where she was considering more surgery.  On that date, Dr. Fras reported that plaintiff returned to see him with neck pain and bilateral shoulder pain.  X-rays revealed that the "fusion does not appear to be really very consolidated at C4-C5 and C6-C7."  Dr. Fras' impression was "possible pseudoarthrosis at C4-C5 and C6-C7."  Most telling that the ALJ had made a premature decision that plaintiff's condition had improved enough just eight weeks after surgery for her to return to work is the fact that in September 2007 further surgery by Dr. Fras was being considered.  Dr. Fras stated that he discussed both surgical and nonsurgical options with plaintiff, and added that "she has certainly tried a lot of nonsurgical options such as physiotherapy and injections.  These have not really gotten her tremendous amount of relief.  She would like to consider surgical intervention" (See report attached to Plaintiff's Motion for Summary Judgment).

This evidence is also "material" and does not involve a later acquired disability.  In addition, the new evidence could change the outcome of the Commissioner's decision because it is both probative and relevant to a condition that plaintiff had suffered with for some time and required two operative fusion procedures and possibly another.

Lastly, there is "good cause" for the new evidence not being in the record.  The ALJ closed the period of disability as of May 8, 2006 only approximately eight weeks after plaintiff's second surgery.  At the administrative hearing on July 24, 2006, the ALJ gave plaintiff two weeks to supplement the record.  Thus, the evidence discussed above from Dr. Fras after this date was not available in time for submission to the ALJ.  Thus, we find "good cause" for the

15

additional evidence not being submitted to the ALJ.

      Accordingly, this matter should be remanded to consider the reports from Dr. Fras subsequent to May 9, 2006 and any other additional evidence relevant to plaintiff's neck condition.  In addition, no doctor is in a better position than plaintiff's treating surgeon, Dr. Fras, to give an opinion as to plaintiff's ability to do gainful work activity[9].  Accordingly, we further recommend that upon remand the ALJ should also contact Dr. Fras and seek such an opinion if Dr. Fras has not given one in any updated reports.[10]

      Therefore, the court makes the following:

---

[9]"Treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir.1987).

[10]20 C.F.R. § 404.1512(e) provides in part that:
      "We [Social Security Administration] will seek clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory techniques . . . "

## <u>RECOMMENDATION</u>

AND NOW, this        day of                , 2008, it is respectfully **RECOMMENDED** that defendant's motion for summary judgment be  **DENIED;** plaintiff's motion for summary judgment be **GRANTED,** and the matter **REMANDED** to the Commissioner of the Social Security Administration in accordance with the sixth sentence of 42 U.S.C. Section 405(g)..

S/ Linda K Caracappa

_____

**LINDA K. CARACAPPA**
**UNITED STATES MAGISTRATE JUDGE**